UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| SHERMA JOHNSON, | |
| Plaintiff, | Case No. 3:23-cv-00875 |
| v. | Judge Eli J. Richardson |
| | Magistrate Judge Alistair E. Newbern |
| PENNYMAC LOAN SERVICES, LLC, et al., | |
| Defendants. | |

To:     The Honorable Eli J. Richardson, District Judge

## REPORT AND RECOMMENDATION

Pro se Plaintiff Sherma Johnson filed a complaint against Defendants PennyMac Loan Services, LLC (PennyMac) and Secretary of the U.S. Department of Veterans Affairs Denis R. McDonough, asserting that PennyMac and McDonough violated the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605, and several state laws by misapplying her monthly payments on her residential mortgage loan and attempting to foreclose on her property. (Doc. No. 1.) PennyMac has moved to dismiss Johnson's claims against it under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims on which relief can be granted. (Doc. No. 13.) Johnson responded in opposition to PennyMac's motion (Doc. No. 16), and PennyMac has filed a reply (Doc. No. 17). Johnson has also filed a sur-reply. (Doc. No. 18.)

The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 12.) For the reasons that follow, the Magistrate Judge will recommend that the Court grant PennyMac's motion to dismiss.

## I.     Background

### A.     Factual Background[1]

Johnson is a United States veteran. (Doc. No. 1.) She obtained a residential mortgage "VA loan" in the amount of $211,00.00 to purchase her home in Clarksville, Tennessee. (Doc. No. 1, PageID# 4, ¶ 17.) Johnson executed a deed of trust to secure that loan, which was recorded on September 11, 2017. (Doc. No. 1; Doc. No. 13-1.) The deed of trust shows that Johnson obtained the loan from First Liberty Financial Mortgage (First Liberty) and conveyed the property to First Liberty's beneficiary and nominee Mortgage Electronic Registration Systems, Inc. (MERS). (Doc. No. 13-1.) On November 1, 2021, MERS assigned the deed of trust to PennyMac through a corporate assignment, which was recorded the next day. (*Id.*)

Johnson alleges that she "made timely payments on her mortgage" loan to PennyMac, but PennyMac did not give her "proper credit for all of her payments . . . on her mortgage account . . . ." (Doc. No. 1, PageID# 3, 7, ¶¶ 11, 36.) Johnson further alleges that PennyMac charged and collected "late fees, property inspection fees, and attorney fees" to which it is not entitled; Johnson states that she made "numerous pleas" to PennyMac and McDonough to "correct her account" and

---

[1]     The facts in this section are drawn from Johnson's complaint (Doc. No. 1); three exhibits attached to the complaint that include her communications with PennyMac and accompanying transactional documents (Doc. No. 1-1); and two exhibits that PennyMac attaches to its motion to dismiss that include the deed of trust and corporate assignment recorded in the Montgomery County, Tennessee, real property records (Doc. No. 13-1). The Court finds Johnson's attachments to be written instruments that are properly considered as part of the pleading under Federal Rule of Civil Procedure 10(c) and incorporates relevant statements from those documents into this factual background. *See* Fed. R. Civ. P. 10(c). Because Johnson references the deed of trust and corporate assignment, those documents are incorporated into her complaint and the Court may consider them without converting the motion to dismiss into a motion for summary judgment. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) ("[W]e have recognized that if a plaintiff references or quotes certain documents, . . . a defendant may attach those documents to its motion to dismiss, and a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment." (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997))).

"to take off all the unauthorized fees . . . ." (*Id.* at PageID# 7, 11, ¶¶ 33, 37, 38, 58.) Instead of making these "timely and appropriate corrections to [her] account[,]" PennyMac "refused to refund" the fees. (*Id.* at PageID# 5, 7, ¶¶ 26, 38.) PennyMac also "reported adverse credit information about [her] to [ ] credit bureaus" and "publish[ed] false information about her and her property in the newspaper." (*Id.* at PageID# 5, 9, ¶¶ 25, 46.) Johnson further alleges that PennyMac and McDonough made "harassing phone calls [to her] and sen[t] her numerous threatening letters . . . ." (*Id.* at PageID# 7, ¶ 33.)

At some point, Johnson's loan went into forbearance as a result of the COVID-19 pandemic. (Doc. No. 1-1.) Johnson "ended [her] forbearance plan" (*id.* at PageID# 19) and "requested assistance from" PennyMac via a loan modification under the "Veterans Administration (VA) COVID Refund Modification and Partial Claim Full Documentation" program. (Doc. No. 1, PageID# 3, ¶ 11; Doc. No. 1-1, PageID# 30.) On March 13, 2023, PennyMac notified Johnson by letter that, because she had ended her forbearance plan, the mortgage payments that she did not make during the forbearance period were now due. (Doc. No. 1-1.) PennyMac informed Johnson that it had "programs available that may . . . help [her]" "resume making payments" and "bring [her] account current[,]" but that PennyMac needed "the information [it had] previously requested" to review her request for loan modification and determine whether her loan qualified for those programs. (*Id.* at PageID# 19.) PennyMac also advised Johnson that she "c[ould] return to forbearance" if she was "still experiencing a COVID-19 hardship[.]" (*Id.*)

Johnson alleges that her request for loan modification "was denied without reason" and that she requested information regarding the denial in May 2023, but "has yet to receive a clear response from" PennyMac. (Doc. No. 1, PageID# 3, ¶ 11.) In a notice letter dated May 1, 2023,

3

PennyMac informed Johnson that "[she] d[id] not qualify for a loan modification per the guidelines established for the applicable loan modification programs" because "[her] current rate is less than the program guidelines" and that PennyMac "d[id] not have modification programs available for [Johnson's] loan." (Doc. No. 1-1, PageID# 27, 30.) Johnson alleges that, on or about June 10, 2023, she received correspondence from PennyMac dated June 6, 2023, enclosing a "copy of [her] Loan Document" that she had previously requested. (Doc. No. 1; Doc. No.1-1, PageID# 18.) Johnson alleges that the letter "outlin[ed] the loan modification review" but "fail[ed] to state the reasons why [her request] was denied and instead[ ] provide[d] an appraisal of her property." (Doc. No. 1, PageID# 3, ¶ 12.) Johnson asserts that servicers of VA loans "have more responsibility in reviewing the loan for possible modification and[/]or other alternatives to foreclosure" than other mortgage servicers and that she "was not provided any resources as required under the VA guideline[s]." (*Id.* at PageID# 4, ¶ 17.) Johnson further alleges that PennyMac did not provide her with the opportunity to appeal the denial of her loan modification request and has "failed to comply with [her] requests for assistance." (*Id.* at ¶ 15.)

Johnson alleges that "PennyMac is attempting to foreclose on" her Clarksville property but that PennyMac "has no right to do so as [she] was not provided a notice of default, [a] notice of intent[,] or an opportunity to appeal the alleged loan modification denial." (*Id.* at PageID# 5, ¶ 21.) Johnson states that, on or about July 12, 2023, she noticed an update to her PennyMac online portal, where she "found a [n]otice of [d]efault and [n]otice of [i]ntent" to "accelerate" dated May 13, 2022. (*Id.* at PageID# 3, ¶ 13; Doc. No. 1-1, PageID# 40.) That notice informed Johnson that she was "in default . . . for failure to pay the amounts due." (Doc. No. 1-1, PageID# 40.) The letter provided that Johnson "must pay" $32,753.85 for "04/01/2020 and subsequent payments" "to cure [the] default[.]" (*Id.*) Johnson alleges that she never received that notice of default and that, at the

time the notice was "issu[ed], [she] was still awaiting [PennyMac's] decision [on] [her] loan modification" request. (Doc. No. 1, PageID# 3, ¶ 13.)

Johnson alleges that, less than a week later, she received a July 12, 2023 letter from Marinosci Law Group (MLG), PennyMac's foreclosure counsel, informing her that a sale of her property would occur "on August 22, 2023[,] at 12pm at the Montgomery County Courthouse in Clarksville, TN." (*Id.* at ¶ 14; Doc. No. 1-1, PageID# 46.) The letter included "a [n]otice of [s]uccessor [t]rustee [s]ale" and identified MLG as the "[s]uccessor [t]rustee" who will "offer for sale to the highest bidder" Johnson's Clarksville property on that date. (Doc. No. 1-1, PageID# 46, 47.) Johnson alleges that, since April 2021, PennyMac and MLG have conspired to "[u]nlawfully tak[e] and appropriat[e] [her] money and property . . . ." (Doc. No. 1, PageID# 10, ¶ 57.a.)

Johnson states that she now "face[s] [ ] foreclosure" on her Clarksville property and that she does not have any "adequate remedy [at] law" other than filing this action against PennyMac and McDonough. (*Id.* at PageID# 4, ¶ 18.)

## B. Procedural History

Johnson initiated this action by filing a complaint against PennyMac and McDonough. (Doc. No. 1.) Johnson asserts the following claims against PennyMac: wrongful foreclosure; RESPA violations; intentional infliction of emotional distress; conversion; tortious interference with property rights; defamation; and violations of the Tennessee Racketeer Influenced and Corrupt Organization (RICO) Act, Tennessee Code Annotated §§ 39-12-201, 204.[2] (*Id.*) Johnson

---

[2]    In her complaint, Johnson asserts one count for "attorneys' fees and expenses" (Count 8) and one count for "punitive damages" (Count 9). (Doc. No. 1, PageID# 15.) To the extent Johnson styles punitive damages and attorneys' fees as separate causes of action, the Court will recommend that they be dismissed. *See Johnson v. BLC Lexington SNF, LLC*, Civ. Action No. 5:19-064, 2019 WL 2476739, at *11 (E.D. Ky. June 13, 2019) (where plaintiff styled punitive damages and causation and damages, including attorney's fees, as separate causes of action, the court dismissed

seeks monetary damages, costs, and a "[p]reliminary [i]njunction against the foreclosure . . . until [this litigation is] resolved." (*Id.* at PageID# 16, ¶ [ ]76.10.)

Johnson twice requested leave to proceed *in forma pauperis* (Doc. Nos. 2, 8), but the Court denied Johnson's applications and ordered Johnson to pay the Court's civil filing fee (Doc. Nos. 7, 9). Johnson paid this Court's civil filing fee. (Doc. No. 10.)

On October 20, 2023, PennyMac filed a motion to dismiss Johnson's claims against it under Federal Rule of Civil Procedure 12(b)(6) for failure to state claims on which relief can be granted. (Doc. No. 13.) PennyMac certified that it electronically filed its motion and served it on Johnson via first class mail on the same day. (*Id.*)

On December 8, 2023, the Clerk of Court received Johnson's "reply in opposition to [PennyMac's] motion to dismiss," which the Court construes as Johnson's response to PennyMac's motion. (Doc. No. 16, PageID# 134; Doc. No. 16-1.) In her response, Johnson argues that she "has plead[ed] sufficient facts to support express or inferential allegations of all material elements of her claims" and that the Court should deny PennyMac's motion or, in the alternative, grant Johnson leave to amend her claims. (Doc. No. 16, PageID# 135.) Johnson certifies that she sent her response to PennyMac via first class mail on October 31, 2023. (Doc. No. 16.) In a cover letter, Johnson states that "[she] submitted [her motion] online through PACER [but] it [was] not show[ed] [as] received" and requests that her filing be "add[ed] to [the] case files." (Doc. No. 16-1, PageID# 138.)

On December 12, 2023, PennyMac filed a reply in support of its motion to dismiss. (Doc. No. 17.) PennyMac makes two additional arguments in favor of dismissal in its reply. First,

---

these claims but stated that their dismissal did not "impede [plaintiff's] ability to seek [attorney's fees and] punitive damages as [ ] remed[ies] if she proves she is entitled to [them]")

PennyMac argues that Johnson's response in opposition is untimely and that the Court should therefore grant its motion to dismiss as unopposed. (*Id.*) Second, PennyMac argues that Johnson's response "fails to address any of the legal or factual arguments" that PennyMac raised in its motion to dismiss and therefore Johnson has conceded those arguments. (*Id.* at PageID# 141, 142.) PennyMac also opposes what it characterizes as Johnson's "afterthought" request for leave to amend her complaint as procedurally improper. (*Id.* at PageID# 142, 143.) Johnson filed a sur-reply, without requesting the Court's permission, arguing that her response in opposition to PennyMac's motion to dismiss was timely and "provid[ing] . . . again" her arguments against dismissal. (Doc. No. 18, PageID# 145–46.)

## II.      Legal Standard

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint contain "a short and plain statement of the claim[.]" Fed. R. Civ. P. 8(a)(2). However, "[t]he factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). A plaintiff must plead more than "'labels and conclusions[,]'" "'a formulaic recitation of the elements of a cause of action[,]'" or "'naked

assertion[s]' devoid of 'further factual enhancement.'" *Id.* (third alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Because Johnson appears pro se, the Court construes her filings "'liberally'" and holds her complaint "'to less stringent standards than formal pleadings drafted by lawyers[.]'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "However, this lenient treatment has limits." *Frengler v. Gen. Motors*, 482 F. App'x 975, 976 (6th Cir. 2012). "[C]ourts are not required to conjure up unpleaded allegations or guess at the nature of an argument." *Brown v. Cracker Barrel Rest.*, 22 F. App'x 577, 578 (6th Cir. 2001) (citing *Wells v. Brown*, 891 F.2d 591, 594 (6th Cir. 1989)).

## III.     Analysis

### A.     Johnson's Response in Opposition to PennyMac's Motion to Dismiss and Sur-Reply

PennyMac is correct that Johnson's response in opposition to its motion to dismiss is untimely under this Court's Local Rules. PennyMac filed its motion to dismiss on October 20, 2023, and served Johnson by mail. Johnson's response in opposition was therefore due no later than November 6, 2023. *See* M.D. Tenn. R. 7.01(a)(3) (response) (providing that "any party opposing a motion must serve and file a memorandum of law in response . . . not later than fourteen (14) days after service of the motion"); Fed. R. Civ. P. 6(d) (providing that "three days" are added to a response time period when service is made by mail). Johnson filed her response in opposition on December 8, 2023. (Doc. No. 16.)

Under Rule 6(b)(1)(B), "the court may, for good cause, extend the time" "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ.

P. 6(b)(1)(B). Johnson did not move to extend the response deadline and has not shown good cause or excusable neglect as required by Rule 6. Instead, Johnson's filings contain conflicting statements regarding her efforts to timely file her response. In her sur-reply, Johnson states that she mailed her response and that a USPS delivery receipt confirms that the response "was delivered to the Court on or about November 3, 2023." (Doc. No. 18, PageID# 145.) Johnson has not provided the delivery receipt for the Court's review. In the undated letter attached to her response, Johnson states that she attempted to "submit[ ] [her response] through PACER[,]" but it was "not . . . received." (Doc. No. 16-1, PageID# 138.) But, while PACER allows the public to access federal court records electronically, it does not provide a way to file documents in this or any other federal court. *See* PACER, Frequently Asked Questions, https://pacer.uscourts.gov/help/faqs. Instead, the Court's Case Management/Electronic Case Files (CM/ECF) system is the only way to file electronically, and Johnson has acknowledged that she is a "Pro Se filer without e-filing privileges[.]" (Doc. No. 18, PageID# 145.)

Further, even if the Court were to consider Johnson's response on its merits, Johnson has not addressed any of PennyMac's substantive arguments. (Doc. No. 16.) Johnson's four-paragraph response contains only conclusory arguments and a statement of the legal standard for resolving motions to dismiss. (*Id.*) For example, Johnson asserts that "Sixth Circuit law require[s] th[is] Court to accept all express and inferential factual allegations as true to determinate [whether] [she] has stated a plausible claim" and argues that she "is not required to provide every fact that may be raised at trial" or "to show a probability at the pleading stage." (*Id.* at PageID# 134–35.) This is a correct statement of the applicable legal standard, but it is not an argument demonstrating why Johnson has met that standard in her complaint. As to Johnson's "alternative" "request [for] leave to amend" her complaint, Johnson does not seek leave to amend her complaint under Rule 15 in

her response; instead, she asserts only that she would seek to amend her complaint should the Court grant PennyMac's motion to dismiss. (Doc. No. 16, PageID# 135)

Because Johnson's response is untimely, the Court may consider PennyMac's motion unopposed under Local Rule 7.01(a)(3). Johnson's response is also legally deficient. But the Court may not grant PennyMac's motion to dismiss solely because it is unopposed. *See Gesenhues v. Radial, Inc.*, No. 19-5932, 2020 WL 1815738, at *2 (6th Cir. Mar. 23, 2020) ("To the extent it granted [defendant's] motion to dismiss only because it was unopposed, the court would have abused its discretion." (citing *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991))). A "movant must always bear [its] initial burden regardless if an adverse party fails to respond." *Carver*, 946 F.2d at 455; *see also id.* ("[A] district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded. The court is required, at a minimum, to examine the movant's motion for summary judgment to ensure that he has discharged that burden. We see no reason why the situation should be different in the context of a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6)."). The Court is therefore "required to examine [PennyMac's] motion and [Johnson's] complaint to ensure that [PennyMac] [has] met its burden of establishing that it [is] entitled to dismissal . . . ." *Gesenhues*, 2020 WL 1815738, at *2 (citing *Carver*, 946 F.2d at 455).

## B.      Johnson's Claims Against PennyMac

PennyMac argues that the Court should dismiss Johnson's claims against it under Rule 12(b)(6) because Johnson has failed to state claims on which relief can be granted. (Doc. Nos. 13, 14.)

### 1.      Count One: Wrongful Foreclosure

PennyMac argues that Johnson's wrongful foreclosure claim should be dismissed because Tennessee law only permits a property owner to sue for wrongful foreclosure if the foreclosure

has been consummated, and Johnson does not allege that her property has been foreclosed upon. PennyMac confirms that it has not foreclosed on Johnson's property when it filed the motion to dismiss. (Doc. No. 14.)

To state a wrongful foreclosure claim under Tennessee law, a plaintiff must allege "that a 'legally held, conducted and consummated' foreclosure involved 'irregularity, misconduct, fraud, or unfairness on the part of the trustee or the mortgagee that caused or contributed to an inadequate price, for a court of equity to set aside the sale.'" *Harris v. LNV Corp.*, No. 3-12-0552, 2014 WL 3015293, at *11 (M.D. Tenn. July 2, 2014) (quoting *CitiMortage, Inc. v. Drake*, 410 S.W.3d 797, 802 (Tenn. Ct. App. 2013)); *see also Parker v. Regions Bank*, Case No. 3:19-cv-00973, 2020 WL 6493995, at *2 (M.D. Tenn. Mar. 4, 2020) (stating standard for a wrongful foreclosure claim). Johnson alleges that "PennyMac is attempting to foreclose on" her property, but that PennyMac "has no right to do so" because it failed to provide her with "a notice of default, [a] notice of intent[,] or an opportunity to appeal the alleged loan modification denial." (Doc. No. 1, PageID# 5, ¶ 21.) Johnson further alleges that PennyMac "exercised the power of sale maliciously and in bad faith." (*Id.* at ¶ 22.) But, by Johnson's own allegations, no foreclosure sale has been held, conducted, or consummated and her claim is not ripe for review. *Harris*, 2014 WL 3015293, at *11.

Accordingly, the Court should grant PennyMac's motion to dismiss Count One of Johnson's complaint.

### 2. Count Two: RESPA Violations

Johnson asserts claims against PennyMac under § 2605(e) and § 2605(k) of RESPA.

#### a. § 2605(e) Claim

RESPA Section 2605(e) addresses the "[d]uty of [a] loan servicer to respond to borrower inquiries[.]" 12 U.S.C. § 2605(e). It requires that, upon the receipt of "a qualified written request

[QWR] from [a] borrower . . . [,]" the servicer of a federally related mortgage loan (1) "provide a written response acknowledging receipt of the correspondence within 5 days" and (2) within thirty days of receipt of the request, the servicer "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties" or investigate and provide the borrower with a written notification explaining or clarifying why "the servicer believes the account of the borrower is correct" or why the servicer does not have or cannot obtain the information requested. 12 U.S.C. § 2605(e)(1)(A), (2)(A), (2)(B)(i). Thus, "[f]or a borrower inquiry to trigger RESPA's procedural requirements, it must meet the definition of a 'qualified written request' [ ]." *Martini v. JPMorgan Chase Bank, N.A.*, 634 F. App'x 159, 160 (6th Cir. 2015) (quoting 12 U.S.C. § 2605(e)).

> RESPA defines a QWR as follows:
>
> For purposes of this subsection, a qualified written request shall be a written correspondence . . . that—
>
> > (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> >
> > (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B); *Lee v. Equifirst Corp.*, No. 3:10-cv-809, 2010 WL 4320714, at *7 (M.D. Tenn. Oct. 26, 2010). The QWR must be related to the "servicing" of the loan, 12 U.S.C. § 2605(e)(1)(A), which includes "receiving any scheduled periodic payments from a borrower" or "making the payments of principal and interest" 12 U.S.C. § 2605(i)(3).

"'To state a viable claim under Section 2605(e), a plaintiff must show that he [or she] sent a correspondence which met the requirements of a QWR, that [the loan servicer] failed to timely respond, and that this failure caused plaintiff actual damages." *Layne v. Ocwen Loan Serv.*, LLC, No. 4:17-CV-4, 2018 WL 1524608 (E.D. Tenn. Mar. 28, 2018) (quoting *Jestes v. Saxon Mortg.*

*Servs., Inc.*, No. 2:11-00059, 2014 WL 1847806, *5 (M.D. Tenn. May 8, 2014). "Courts that have addressed the adequacy of pleading RESPA claims have repeatedly held that a Plaintiff cannot maintain an action under RESPA by merely alleging that they sent a QWR." *Brown v. Fed. Nat'l Mortg. Ass'n*, No. 2:13-cv-02107, 2013 WL 4500569, at *5 (W.D. Tenn. Aug. 19, 2013); *see also id.* (dismissing § 2605(e) RESPA claim because the plaintiff "ha[d] not alleged basic facts that would plausibly demonstrate that he submitted a correspondence that qualified as a QWR"); *Boston v. Ocwen Loan Servicing, LLC*, No. 3:12CV451, 2013 WL 122151, at *5 (W.D.N.C. Jan. 9, 2013) (finding that conclusory allegations that defendant "'failed to properly and timely respond to two'" QWRs were "too threadbare to state a claim for a violation of Section 2605" because "[p]laintiff wholly fail[ed] to allege facts showing that her request for information constituted a 'qualified written request' as required to trigger a lender's obligation" (citations omitted)); *Jensen v. Quality Loan Serv. Corp.*, 702 F. Supp. 2d 1183, 1196 (E.D. Cal. 2010) (finding that "[a] conclusory allegation that the correspondence was a 'Qualified Written Request' is insufficient" because the plaintiff "fail[ed] to allege facts indicating that the written correspondence served on [loan servicer] concerned the servicing of [p]laintiff's loan, which is required to qualify the correspondence as a 'qualified written request' under RESPA"). Where a loan servicer responded to a QWR, courts have routinely dismissed § 2605(e) claims where a plaintiff failed to offer "factual content" or cite some authority to support the claim that the loan servicer's "responses were inadequate." *Mekani v. Homecomings Fin., LLC*, 752 F. Supp. 2d 785, 795 (E.D. Mich. 2010); *see also Hutchens v. Bank of Am. N.A.*, No. 3:11-CV-624, 2012 WL 1618316, at *5 (E.D. Tenn. May 9, 2012) (dismissing claim where plaintiff adequately pleaded that they sent a QWR but "have not alleged . . . that [loan servicer] failed to timely acknowledge receipt and respond to the QWRs as required by § 2605").

Johnson's complaint falls short of these standards. Johnson alleges that she "continued to make qualified written requests that [PennyMac] investigate and correct its errors on her accounts[,]" but that PennyMac "did not take timely action to respond to [her] pleas to correct her account, refused to properly investigate its errors, failed to correct false reporting to the credit bureaus[,] and failed to follow standard servicer's duties and standards of care." (Doc. No. 1, PageID# 5–6, ¶¶ 27, 28.) Such "threadbare" allegations are not sufficient to establish or plausibly demonstrate that Johnson submitted correspondence that qualified as a QWR. *Brown*, 2013 WL 4500569, at *5. While Johnson has offered ample factual allegations regarding her request for loan modification, such requests "do not qualify as QWRs because they do not relate to the loan's servicing." *Martini*, 634 F. App'x at 164.

Johnson also alleges that she requested her loan document and attached the June 6, 2023 letter from PennyMac acknowledging that it received a "request for a copy of your Loan Document for the above-referenced loan" and "enclosed the requested document for your review." (Doc. No. 1-1, PageID# 18.) But courts have held that a request for "copies of loan documents" does not constitute a QWR and therefore cannot be the basis for a § 2605(e) claim. *See, e.g., Minson v. CitiMortgage, Inc.*, Civ. Action No. 12-2233, 2013 WL 2383658, at *5 (D. Md. May 29, 2013); *Barocio v. Bank of America N.A.*, No. C 11-5636, 2012 WL 3945535, at *7 (N.D. Cal. Sept. 10, 2012) ("A request for loan documents . . . is not a proper subject of a QWR."); *McGory v. BAC Home Loan Servicing, LP*, No. 3:10CV1758, 2011 WL 1743475, at *2–3 (N.D. Ohio May 6, 2011) (servicer had no obligation to respond to purported QWR which requested all documents pertaining to the origination of mortgage, "as well as certified copies of loan documents, allonges, assignments and transfer receipts").

Because Johnson has not adequately alleged that she sent correspondence to PennyMac that qualified as a QWR, she has failed to state a RESPA § 2605(e) claim.

**b.    § 2605(k) Claim**

Johnson alleges that PennyMac's failure to "take timely action to respond to [her] requests to correct her loan" also violated RESPA § 2605(k). (Doc. No. 1, PageID# 6, ¶ 28.) Section 2605(k)(1)(C) prohibits a servicer from "fail[ing] to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or avoiding foreclosure, or other standard servicer's duties[.]" 12 U.S.C. § 2605(k)(1)(C). PennyMac has not directly addressed Johnson's § 2605(k)(1)(C) claim.

"[A] plaintiff's obligation to provide the 'grounds' of [her] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). Here, Johnson has simply restated the language of the statute without alleging supporting facts to demonstrate PennyMac's violation of the statute and, thus, she fails to state a claim on which relief can be granted. *See Twombly*, 550 U.S. at 555; *see also Tanner v. Wells Fargo Bank, N.A.*, No. 1:20-CV-01104, 2020 WL 7263292, at *9 (N.D. Ohio Dec. 10, 2020) ("At the very least, the Court finds that Plaintiff's RESPA claim pursuant to 2605(k)(1)(C) must be dismissed because Plaintiff fails to plead how Wells Fargo's responses to Plaintiff's inquiries constitute untimely action to respond to Plaintiff under 2605(k)(1)(C).") Moreover, Johnson agrees that PennyMac responded to her requests and does not plead any facts to show that PennyMac's response was untimely. Therefore, Johnson has not adequately alleged a claim under § 2605(k)(1)(C). *See Christenson v. CitiMortgage, Inc.*, 255 F. Supp. 3d 1099,1106–07 (D. Colo. 2017) (finding that "plaintiffs have no claim under § 2605(k)(1)(C)" where defendants took approximately two months to respond to

15

plaintiffs' request "because § 2605(k)(1)(C) merely requires servicers to either respond or take timely action to respond to borrowers' requests to correct certain" errors); *see also Mader v. Wells Fargo Bank, N.A.*, Civ. No. 16-cv-309, 2017 WL 177619, at *5, (D.N.H. Jan. 17, 2017) ("Although the [plaintiffs] assert that [defendant] failed to respond to their request to avoid foreclosure, the [plaintiffs] acknowledge that [defendant] eventually denied their modification application. Thus, the [plaintiffs'] amended complaint establishes that [defendant] did in fact respond to the [plaintiffs'] request to avoid foreclosure and evaluate their modification application.").

Accordingly, the Court should grant PennyMac's motion to dismiss Count Two of Johnson's complaint.

### 3.    Count Three: Intentional Infliction of Emotional Distress (IIED)

To state a claim for intentional infliction of emotional distress under Tennessee law, a plaintiff must allege that: "(1) the defendant's conduct was intentional or reckless; (2) the defendant's conduct was so outrageous that it cannot be tolerated by civilized society; and (3) the defendant's conduct resulted in serious mental injury to the plaintiff." *Lourcey v. Estate of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004) (citing *Bain*, 936 S.W.2d at 622); *see also Best v. Portfolio Recovery Assocs., LLC*, Case No. 3:16-cv-03140, 2018 WL 11475749, at *5 (M.D. Tenn. Mar. 13, 2018) (providing the elements to state an IIED claim under Tennessee law). As to whether conduct is "so outrageous" to satisfy the second element, the Tennessee Supreme Court has

> emphasized that it is not sufficient that a defendant "has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress." A plaintiff must in addition show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Lourcey*, 146 S.W.3d at 51 (first quoting *Bain*, 936 S.W.2d at 622; and then quoting *Miller v. Willbanks*, 8 S.W.3d 607, 614 (Tenn. 1999); *see also Miller*, 8 S.W.3d at 614 (quoting Restatement (Second) of Torts § 46 cmt. d (Am. L. Inst. 1965)). In short, conduct is actionable where "'the

16

recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"'" *Bain*, 936 S.W.2d at 623 (quoting *Medlin v. Allied Inv. Co.*, 398 S.W.2d 260, 274 (Tenn. 1966)). "[R]ecovery for intentional infliction of emotional distress is limited to mental injury which is 'so severe that no reasonable [person] would be expected to endure it.'" *Arnett v. Domino's Pizza I, L.L.C.*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003) (alteration in original) (quoting *Miller*, 8 S.W.3d at 615 n.4).

PennyMac's only argument for dismissal of Johnson's IIED claim is that Johnson's allegations do not "rise to the level of outrageousness required to show that [PennyMac] acted 'beyond all bounds of decency'" and "show that PennyMac lawfully acted for the purpose and within the scope of servicing [Johnson's] [l]oan, and within the rights afforded to PennyMac by the Deed of Trust." (Doc. No. 14, PageID# 119 (quoting *In re Jenkins*, 488 B.R. 601, 617 (Bankr. E.D. Tenn. 2013)).) PennyMac does not argue that the complaint fails to adequately allege that its conduct was intentional or reckless or that Johnson suffered serious emotional injury as a result of PennyMac's conduct.

Johnson alleges that PennyMac "flagrantly and intentionally ignor[ed] [her] numerous pleas over the years to correct her account and her loan and instead repeatedly call[ed] her with harassing phone calls and sen[t] her numerous threatening letters and refus[ed] to correct the false reporting [of her credit] to the credit bureaus . . . ." (Doc. No. 1, PageID# 7, ¶ 33.) The Tennessee Supreme Court has explained that "'[t]he general rule is that a creditor has a right to urge payment of a just debt, and to threaten to resort to proper legal procedure to enforce the obligation.'" *Moorhead v. J.C. Penney Co.*, 555 S.W.2d 713, 718 (Tenn. 1977). But, where the creditor "willfully and intentionally [seeks] to produce the mental or emotional disturbance in the debtor for the purpose of forcing the latter to pay the debt, by sending coarse and vindictive letters, or by

threatening to appeal to the debtor's employer[,]" the creditor may be held "liable . . . [for] [ ] mental or emotional disturbance . . . ." *Moorhead*, 555 S.W.3d at 718; *see also MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 143 (6th Cir. 2009) (citing *Moorhead* for the proposition that "Tennessee courts have previously recognized that aggressive debt collection practices can give rise to liability for outrageous conduct").

In *Moorhead*, the Tennessee Supreme Court found that the plaintiffs adequately pleaded outrageous conduct by a creditor where they alleged facts to show that they owed the creditor nothing at all—rather, the creditor had erroneously recorded an owed refund as a new charge; continued to send "threatening letters, telephone calls, etc., . . . long after [it] had acknowledged that its accounts were in error and that plaintiffs owed it nothing"; and made "threats to deliberately injure the plaintiffs' credit reputation and jeopardize their job security." *Moorhead*, 555 S.W.2d at 717. In *MacDermid v. Discover Financial Services*, the Sixth Circuit found the key factor of *Moorehead* to be the fact that the creditor continued its efforts to collect what it knew was not a valid debt and distinguished MacDermid's case because MacDermid admitted that the creditor defendant had a right to collect charges accrued by his wife while in the throes of mental illness. 488 F.3d 721, 731 (6th Cir. 2007). The court found that these facts placed *MacDermid* "more squarely in the realm of cases in which a defendant creditor or collection agency was . . . justified in collecting the debt" and in which Tennessee courts had found even allegations of "'harassment, coercion, and intimidation'" and "'abusive and insulting'" conduct insufficient to state an IIED claim. *Id.* (collecting cases). Still, the court found that MacDermid adequately pleaded outrageous conduct "because his complaint allege[d] false threats by Discover employees of *criminal prosecution*" and that, therefore, "his case may be distinguished from most of the Tennessee authorities regarding creditors' attempts to collect a debt, justified or unjustified." *Id.*

Here, like the plaintiff in *MacDermid*, Johnson admits that PennyMac was servicing a valid mortgage debt; PennyMac thus had a right to collect any debt that Johnson owed by reasonable means. Johnson's general allegations of "harassing phone calls" and "threatening letters" are insufficient to allege that PennyMac's conduct crossed the line into the type of "improper methods" that could constitute actionable outrageous conduct. (Doc. No. 1, PageID# 7, ¶ 33); *Moorhead*, 555 S.W.2d at 718. Johnson has not adequately pleaded the second element of IIED claim. *See, e.g.*, *Patterson v. Prof'l Adjustment Serv., Inc.*, 544 S.W.2d 617, 620–21 (Tenn. Ct. App. 1976) (dismissing plaintiff's outrageous conduct claim for failure to state a claim even though defendant "attempted to collect a small balance through harassment, coercion, and intimidation"); *cf. Finley v. Kelly*, 384 F. Supp. 3d 898, 915 (M.D. Tenn. 2019) (finding the complaint's bare and unspecific allegations that plaintiff received "lengthy voicemails[,]" "'literally hundreds of emails[,]'" and "'messages several times per week'" during a four-year period did not rise to the level of being outrageous).

Accordingly, the Court should grant PennyMac's motion to dismiss Count Three of Johnson's complaint.

### 4. Count Four: Conversion

PennyMac next argues that the Court should dismiss Johnson's conversion claim because PennyMac lawfully obtained the disputed payments by Johnson "pursuant to [Johnson's] payment obligations under the Loan and Deed of Trust" and Johnson's allegations lack specificity. (Doc. No. 14, PageID# 121.)

To state a claim for conversion under Tennessee law, a plaintiff must show that the defendant has (1) "appropriated something belonging to the plaintiff to its own use and benefit," (2) "by the exercise of dominion over it," 3) "in defiance of the plaintiff's right." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977). Therefore, "[t]o be

liable for conversion, the defendant 'need only have an intent to exercise dominion and control over property that is in fact inconsistent with the plaintiff's rights, and do so.'" *Hanna v. Sheflin*, 275 S.W.3d 423, 427 (Tenn. Ct. App. 2008) (quoting *Mammoth Cave Prod. Credit Ass'n*, 569 S.W.2d at 836). "Misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion." *PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 553–54 (Tenn. Ct. App. 2012) (quoting 90 C.J.S. Trover and Conversion § 16 (2012)). Fundamentally, however, "[t]here can be . . . no conversion of money unless there was an obligation on the part of the defendant to deliver specific money to the plaintiff or unless the money was wrongfully received by the defendant," and a conversion claim cannot be used to "enforce a mere obligation to pay money or for money had and received for payment of a debt." *Id.* at 554 (quoting *id.*). "[T]he plaintiff must allege and prove facts showing a right to immediate possession of the property at the time of conversion." *Id.* (quoting 90 C.J.S. Trover and Conversion § 88); *see also Hawkins v. Hart*, 86 S.W.3d 522, 535 (Tenn. Ct. App. 2001) (same).

Johnson alleges that PennyMac "has charged and in many cases has collected . . . fees to which it was not entitled" including "late fees, property inspection fees, and attorney fees" and has refused to refund her payments of those fees. (Doc. No. 1, PageID# 7, ¶ 38.) Johnson also alleges that PennyMac "convert[ed] the payments [Johnson] made . . .on her loan" and did not apply them to her account "despite numerous demands" that it do so. (*Id.* at PageID# 8, ¶ 39.) Again, Johnson's conclusory allegations are insufficient to state a claim. Johnson does not include allegations to show how PennyMac misapplied payments in a manner that was contrary to her obligations. *See Royal v. Select Portfolio Servicing, Inc.*, No. 11-2214, 2012 WL 174950, at *6 (W.D. Tenn. Jan. 20, 2012) (dismissing conversion claim where plaintiff alleged that mortgage

servicer misapplied her monthly escrow payments because the plaintiff alleged "no facts . . . identifying how Defendant allegedly used or benefitted from these converted funds").

Accordingly, the Court should grant PennyMac's motion to dismiss Count Four of Johnson's complaint.

### 5. Count Five: Tortious Interference with Property Rights

Johnson alleges that PennyMac's notice of default on her residential loan "interfere[d] with [her] enjoyment and use of her property" or "with her rights in her property" because "PennyMac was on notice that [Johnson] was not, in fact, in default on her loan, and then [sought] foreclosure on [her] property despite that notice . . . ." (Doc. No. 1, PageID# 7, ¶¶ 41–43.).

Trespass "and conversion are intentional torts involving interference with an owner's property rights." *Ladd v. Nashville Booting, LLC*, No. 3:20-cv-00626, 2021 WL 3363448, at *8 (M.D. Tenn. Aug. 3, 2021) (quoting *Kauffman v. Forsythe*, No. E2019-02196-COA-R3-CV, 2021 WL 2102910, at *4 (Tenn. Ct. App. May 25, 2021) (citing Restatement (Second) of Torts §§ 217, 222A))). The Court has already addressed Johnson's conversion claim and found it insufficient to withstand PennyMac's motion to dismiss. Any allegations of trespass that can be considered part in her claim of tortious interference with property rights fare no better.

"Trespass protects a landowner's right to exclusive possession" and "[a]ny unauthorized entry upon the property of another is a trespass." *Kauffman*, 2021 WL 210910, at *5 (citing *Morrison v. Smith*, 757 S.W.2d 678, 681 (Tenn. Ct. App. 1988)). Under Tennessee law, the "elements of a trespass claim are: '(1) an intentional entry or holdover; (2) by the defendant or a thing; (3) without consent or legal right.'" *FemHealth USA, Inc. v. Williams*, 2023 WL 5498055, at *6 (M.D. Tenn. Aug. 23, 2023) (quoting *Twenty Holdings, LLC v. Land S. TN*, No. M2018-01903-COA-R3-CV, 2019 WL 4200970, at *8 (Tenn. Ct. App. Sept. 5, 2019)). Johnson does not allege that PennyMac entered her property. Instead, she alleges that PennyMac "interfered with

[her] enjoyment of her property" by finding her loan to be in default and "seeking foreclosure." (Doc. No. 1, PageID# 8 ¶ 42.) These allegations are insufficient to support a trespass claim under Tennessee law.

Accordingly, the Court should grant PennyMac's motion to dismiss Count Five of Johnson's complaint.

### 6.     Count Six: Defamation

PennyMac argues that Johnson's defamation claim should be dismissed because it is preempted by the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681, and it lacks specific factual allegations sufficient to establish PennyMac's plausible liability. (Doc. No. 14.)

#### a.     Whether Johnson's Defamation Claim is Preempted by FCRA

The FCRA "is designed to protect consumers from inaccurate information in consumer reports by establishing credit reporting procedures which 'utilize correct, relevant and up-to-date information in a confidential and responsible manner.'" *Nelski v. Trans Union, LLC*, 86 F. App'x 840, 843–44 (6th Cir. 2004) (quoting *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 965 (6th Cir. 1998)). The Act sets requirements and duties for consumer reporting agencies, users of consumer reports, and furnishers of information to consumer reporting agencies. *Barkho v. Homecomings Fin., LLC*, 657 F. Supp. 2d 857, 864 (E.D. Mich. 2009). A furnisher of information is an "entity . . . which transmits information concerning a particular debt owed by a particular customer to consumer reporting agencies." *Id.* (quoting *Carney v. Experian Info. Sols., Inc.*, 57 F. Supp. 2d 496, 601 (W.D. Tenn. 1999)). As established by the Act, a furnisher must provide consumer reporting agencies with accurate information and must investigate and report inaccurate information upon notice. *Id.* (citing 15 U.S.C. § 1681s-2).

The FCRA contains two sections that preempt state-law claims against persons who furnish information to consumer reporting agencies. The first, contained in 15 U.S.C. § 1681h(e), prohibits

consumers from bringing state-law actions "proceeding in the nature of defamation . . .with respect to the reporting of information against any . . . person who furnishes such information to a consumer reporting agency, based on . . . information disclosed by a user of a consumer report or for a consumer against whom the user has taken adverse action, based in whole or in part on the report except as to false information furnished with malice or willful intent to injury such consumer." 15 U.S.C. § 1681h(e). The second provision, contained in 15 U.S.C. § 1681t(b)(1)(F), states that "[n]o requirement or prohibition may be imposed under the laws of any State" "with respect to any subject matter under section 1681s-2 . . . relating to the responsibilities of persons who furnish information to consumer reporting agencies[.]" 15 U.S.C. § 1681t(b)(1)(F). Section 1681s-2 prohibits furnishers from providing information that "[they] know[ ] or ha[ve] reasonable cause to believe . . . is inaccurate" to consumer reporting agencies and imposes a "[d]uty to correct and update information" that they determine "is not complete or accurate." 15 U.S.C. §§ 1681s-2(a)(1)(A), (a)(2). The Sixth Circuit holds that the FCRA "preempts all state law[ ] . . . causes of action concerning a furnisher's reporting of consumer credit information to consumer reporting agencies[,]" including causes of action that would otherwise be preserved by § 1681h(e). *Scott v. First Southern National Bank*, 936 F.3d 509, 521–22 (6th Cir. 2019).

Because Johnson alleges that PennyMac defamed her with "intentional and malicious" intent, Section 1681h(e) does not preempt Johnson's state-law defamation claim. *See Pone v. Messerli & Kramer P.A.*, Case No. 19-CV-2149, 2020 WL 5798551, at *6 (D. Minn. Sept. 29, 2020). Nonetheless, the defamatory conduct Johnson alleges is regulated under § 1681s-2 because Johnson alleges that PennyMac defamed her by falsely "reporting . . . information about her and her property to the credit bureaus." (Doc. No. 1, PageID# 9, ¶ 45.) Thus, Johnson's state-law defamation claim is preempted under § 1681t(b)(1)(F). *See Sherman v. Portfolio Recovery Assocs.,*

*LLC*, No. 1:21-CV-570, 2022 WL 952540, at *5 (S.D. Ohio Mar. 30, 2022) (finding that defendant is entitled to judgment on the pleadings because plaintiff's "defamation of character" claim was preempted by FCRA where "the subject matter of the complaint clearly falls within the scope of the FCRA, because the injury of which Plaintiff complains is damage to her credit based upon Defendant's furnishing a report to consumer reporting agencies"), *report and recommendation adopted*, 2022 WL 3908944 (S.D. Ohio Aug. 30, 2022).

**b.     Whether Johnson States a Claim for Defamation**

This leaves Johnson's claim that PennyMac defamed her and her business when it falsely "publish[ed] . . . information about her and her property in the newspaper," causing her "severe physical, emotional and financial damage" and "damage to her reputation[ ] and pecuniary loss, including rental income." (Doc. No. 1, PageID# 9, ¶¶ 46, 47.)

To state a defamation claim under Tennessee law, a plaintiff must allege that "(1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other or with reckless disregard for the truth of the statement; or (3) with negligence in failing to ascertain the truth of the statement." *Mcpherson v. Vignobles Sullivan, LLC*, No. 3:20-CV-00384, 2020 WL 7624173, at *1 (M.D. Tenn. Dec. 22, 2020) (citing *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999)); Restatement (Second) of Torts § 580B (Am. L. Inst. 1977). At the motion to dismiss stage, the court's central inquiry is "whether a communication is capable of conveying a defamatory meaning." *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 708 (Tenn. Ct. App. 2012). This "is a question of law for the court to decide in the first instance; it is then for the jury to decide whether the communication was in fact so understood by those who received it." *Id.* at 708–09.

While a plaintiff is not required to include "detailed factual allegations" to state a claim, he or she must nonetheless provide more than "an unadorned, the-defendant-unlawfully-harmed-

me accusation." *Iqbal*, 556 U.S. at 678. Johnson's bare-bones claim fails to surpass this relatively low bar. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 688 (M.D. Tenn. 2018) (dismissing defamation claim where plaintiff's vague allegations that defendant published to "unknown" and unidentified "'third parties'" fell "'short of the line between possibility and plausibility of 'entitle[ment] to relief'") (alteration in original) (quoting *Iqbal*, 556 U.S. at 678)

Accordingly, the Court should grant PennyMac's motion to dismiss Count Six of Johnson's complaint.

### 7. Count Seven: RICO Claim under Tennessee Law

The thrust of Johnson's Tennessee RICO claim is that PennyMac conspired with its foreclosure counsel MLG through "a pattern of racketeering activity" to violate several Tennessee and federal statues by the following predicate acts: (1) unlawfully taking and appropriating her money and property in violation of T.C.A. 39-14-103; (2) unlawfully converting her money and property in violation of.§ 39-14-101; (3) unlawfully obtaining her money and property by deceitful means in violation of § 39-14-104; and (4) unlawfully using the U.S. Postal Service in violation of 18 U.S.C. §§ 1341, 1343. (Doc. No. 1.)

Johnson asserts this claim under the Tennessee Code Annotated §§ 39-12-201, which is Tennessee's criminal RICO Act. Johnson has not provided any authority, and the Court is not aware of any, that the criminal statute provides a civil cause of action.[3] *See* 1 Peter J. Henning, *Corporate Criminal Liability 3D* Appendix 7B, Tennessee (May 2023) (The Act "does not authorize private civil action[.]").

---

[3] In one decision, the Tennessee Court of Appeals declined to "make any determination that the Act authorizes a private right of action." *Martin v. Franklin Cool Springs Corp.*, No. M2014-01804-COA-R3-CV, 2015 WL 7062124, at *1 n.1 (Tenn. Ct. App. Nov. 10, 2015)

PennyMac liberally construes Johnson's cause of action and argues that Tennessee's criminal RICO statute is "analogu[ous] to "the federal RICO [statute]," which provides a private right of action to "'[a]ny person injured in his business or property by reason of a violation' of RICO's substantive restrictions." *Anza v. Ideal Steel Supply Co.,* 547 U.S. 451, 453 (2006) (quoting 18 U.S.C. § 1962). PennyMac argues that Johnson nonetheless fails to state a claim under the federal statute because allegations concerning "a *single* loan and a *single* property are insufficient to establish the pattern of racketeering . . . ." (Doc. No. 14, PageID# 126.)

To state a civil federal RICO claim, a plaintiff must establish the following elements: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Moon v. Harrison Piping Supply*, 465 F.3d 719, 723 (6th Cir.2006) (quoting *Sedima, S.P.R .L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985)). A plaintiff must establish that defendants "engaged in a 'pattern of racketeering activity' consisting of at least two predicate acts of racketeering activity occurring with a ten-year period." *Moon*, 465 F.3d at 723 (quoting 18 U.S.C. § 1961(5)). Merely pleading two predicate acts is insufficient, because the "'term "pattern" itself requires the showing of a relationship' between the predicates" and of the "threat of continuing activity." *H.J., Inc. v. Northwestern Bell Tele. Co.*, 492 U.S. 229, 239 (1989). "It is this fact of *continuity plus relationship* which combines to produce a pattern." *Id.*

This Court addressed an alleged RICO claim involving a mortgage loan in *Hossain v. Ocwen Loan Servicing, LLC*, Civ. No. 3:14-cv-0002, 2015 WL 5243877, at *2 (M.D. Tenn. Sept. 8, 2015). There, the Court found that the plaintiff failed to state a civil RICO claim because "[t]he predicate acts alleged by Plaintiff, even if taken as true, were all directed at one victim, Plaintiff, with the single objective of defrauding him with respect to his own loans. A pattern of racketeering activity does not exist in such situations." *Id.* at *4–5 (citing *Southampton Assocs., L.P. v. K. Jess,*

*Inc.*, No. 93-1616, 1995 WL 25431 (6th Cir. Jan. 23, 1995) (collecting cases); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 135 (6th Cir. 1994) ("We cannot conclude that Flakt's alleged actions here, involving a single victim and a single scheme for a single purpose over seventeen months, constitute the type of 'long-term criminal conduct' Congress sought to prohibit with RICO."), *cert. denied* 513 U.S. 1017 (1994); *Pavuk v. U.S. Bank Nat'l Ass'n ND*, No. 2:09-CV-00514, 2010 WL 3057407, at *4 (S.D. Ohio Aug. 2, 2010) (mailings between the defendant and the plaintiff related only to the plaintiff's own residential mortgage and did not evidence a pattern of racketeering activity); *Dimov v. EMC Mortg. Corp.*, No. 1:09-CV-211, 2010 WL 2506717, at *8 (E.D. Tenn. June 17, 2010) (multiple alleged predicate acts of mail fraud and extortion were keyed to the single objective of depriving the plaintiff of his real property and were not sufficient to show a pattern of racketeering activity).

Johnson alleges that PennyMac fraudulently schemed to misapply her mortgage payments and conspired with MLG to foreclose on her property. Johnson's allegations involve her payments on her own mortgage loan, secured with her own property. As in *Hossain*, these allegations are insufficient to allege a pattern of racketeering activity.

Accordingly, the Court should grant PennyMac's motion to dismiss Count Seven of Johnson's complaint.

## IV. Recommendation

For these reasons, the Magistrate Judge RECOMMENDS that PennyMac's motion to dismiss (Doc. No. 13) be GRANTED and that the Court DISMISS Johnson's claims against PennyMac under Rule 12(b)(6) for failure to state claims on which relief can be granted.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided.

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 20th day of May, 2024.

ALISTAIR E. NEWBERN
United States Magistrate Judge